# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**TAMI HERRING for R.H.,**

        **Plaintiff,**

-vs-                                **Case No. 6:04-cv-1524-Orl-KRS**

**COMMISSIONER OF SOCIAL
SECURITY ADMINISTRATION,**

        **Defendant.**

_____

## ORDER

This cause came on for consideration without oral argument on the Complaint filed by

Tami Herring on behalf of her stepson, Ronald, seeking review of the final decision of the

Commissioner of Social Security denying her claim for social security disability benefits. Doc.

No. 1. The Commissioner answered the Complaint and filed a certified copy of the transcript of

the proceedings before the Social Security Administration (SSA). Doc. Nos. 10, 11. This matter

has been referred to me for disposition under 28 U.S.C. § 636(c) pursuant to the consent of the

parties.

## I.     PROCEDURAL HISTORY.

On January 20, 2002, Herring filed an application for disability benefits under the

Supplemental Security Income for the Aged, Blind, and Disabled Program (SSI), 42 U.S.C. §

1382, *et seq.*, alleging that Ronald was disabled as of January 2, 2002. TR. 50-52. Herring's

claim was denied initially and upon reconsideration.

Herring requested a hearing before an administrative law judge (ALJ), which was held on March 10, 2004.  TR. 185-208.  Herring had a nonattorney representative at the hearing.  TR. 44, 185.  Herring and Ronald both testified at the hearing.

After considering the testimony and medical evidence presented, the ALJ found that Ronald had not engaged in any substantial gainful activity.  TR. 15.  The ALJ concluded that the medical evidence indicated that Ronald suffered from Attention Deficit Hyperactivity Disorder (ADHD) and Oppositional Defiant Disorder (ODD),[1] which were severe impairments.  TR. 16. The ALJ determined that Ronald's impairments did not meet or medically equal the criteria for any of the impairments listed in the applicable social security regulations.[2]  *Id.*

The ALJ evaluated the functional equivalence of Ronald's impairments under six domains, as follows:  (i) acquiring and using information; (ii) attending and completing tasks; (iii) interacting and relating with others; (iv) moving about and manipulating objects; (v) caring for yourself; and (vi) health and physical well-being.  TR. 17-20.[3]  The ALJ found that the medical evidence revealed "more than slight limitations but less than marked limitations" in the domains of attending and completing tasks, and interacting and relating with others.  TR. 18-19.  With respect

---

[1] "Oppositional defiant disorder is a pattern of disobedient, hostile, and defiant behavior toward authority figures.  The pattern must persist for at least 6 months and must go beyond the bounds of normal childhood misbehavior."  *See* MEDLINE PLUS, MEDICAL ENCYCLOPEDIA, http:// www.nlm.nih.gov/medlineplus/ency/article/001537.htm (last visited February 10, 2006).

[2] The Code of Federal Regulations "contains a Listing of Impairments ['the Listings,' found at 20 C.F.R. § 404 app.] specifying almost every sort of medical problem ('impairment') from which a person can suffer, sorted into general categories.  *See* [20 C.F.R.] § 416.925(a). . . ."  *Shinn v. Comm'r of Soc. Sec.*, 391 F.3d 1276, 1278 (11th Cir. 2004).

[3] *See* 20 C.F.R. § 416.926a(b)(1).

to the domain of attending and completing tasks, the ALJ noted that Ronald's ADHD had

"improved with behavioral management interventions and medication."  TR. 18.  The ALJ further

determined that Ronald had no limitations in the domains of acquiring and using information,

moving about and manipulating objects, caring for yourself, and health and physical well-being.

TR. 17-20.

In addition, the ALJ found that Herring's allegations concerning Ronald's  impairments

and resulting functional limitations were "essentially credible," TR. 21, but that the assertions that

his "condition ha[d] resulted in significant functional limitations [was] less persuasive in view of

the totality of the evidence . . . ."  TR. 20.  In reaching this determination, the ALJ did not credit

the opinions of Ronald's targeted care manger, Kelly McCabe, and therapist, Lyris Miller, M.S.,

concluding that they were "somewhat extreme and not consistent with the medical evidence as a

whole."  *Id.*

Herring requested review of the ALJ's decision by the Appeals Council, and submitted

new evidence in support of the request.  TR. 9, 179-84.  The Appeals Council considered the new

evidence but found that it did not provide a basis for changing the ALJ's decision.  TR. 3-5.  This

timely appeal followed.  Doc. No. 1.

## II.     JURISDICTION.

The Commissioner of the SSA issued a final decision after a hearing with respect to

Herring's application for disability benefits under SSI.  Therefore, the Court has jurisdiction over

this matter under 42 U.S.C. § 405(g), as adopted by reference in 42 U.S.C. § 1383(c)(3).

III.     **STATEMENT OF FACTS.**

A.     *Testimony*.

Ronald was born on August 25, 1997.  TR. 50.  Ronald's biological mother smoked crack

cocaine and drank liquor while she was pregnant. TR. 199-200.  Ronald was in foster care until he

was three years old.  TR. 108, 134.  At the time of the hearing, he resided with Herring and his

biological father.  TR. 134.

Herring stated that Ronald had been on medication since January 2001.  The medication

helped Ronald, but it wore off too quickly.  *Id*.  According to Herring, Ronald had trouble

concentrating on a specific task for more than a couple of minutes.  He was fidgety and bit his

nails. TR. 202-03.  He also had trouble communicating at times.  TR. 200.

Ronald has several siblings.  TR. 108, 197.  He occasionally argued and fought with his

siblings.  TR. 197, 202.  According to Herring, Ronald did not listen to her or his father.  TR. 202.

At the time of his hearing, Ronald was in first grade.  TR.  191.  Herring testified that

Ronald was having trouble in school.  TR. 201.  Ronald told the ALJ that spelling tests were his

favorite activity.  He reported that he got all "A's" and "100's" except for two "F's."  TR. 192.

Ronald stated that he had two "best friends" that he played with at school.  TR. 192.  He

argued frequently with a particular classmate.  TR. 194.  Herring stated that when she picked

Ronald up from school or daycare he was "always by himself and never playing with any kids."

TR. 201.

Ronald indicated that he liked to play on the jungle gym.  TR. 193.  Herring described

Ronald as "[v]ery clumsy[,] . . . not very good at playing ball and . . . not very good at playing with

-4-

other children[.]" TR. 201.  Herring testified that Ronald had problems with his motor functioning

in the morning.  His hands would go around in circles, and his head would bob up and down.  TR.

201.

Ronald explained that he brushed his teeth, combed his hair, and dressed himself.  TR. 195.

His mother picked out his clothes, and helped him shampoo his hair.  TR. 195-96, 201.

Ronald stated that he missed a lot of time from school due to illness.  TR. 196.  Ronald

testified that he was sensitive to loud noises.  TR. 196-97.  He had awakened in the night

screaming a few times.  TR. 200.

B.      *School Records.*

Ronald's pre-kindergarten teacher, Leslie J. Robinson, wrote in March 2002 that Ronald's

academic performance was high compared to his classmates.  TR. 85.  However, he had behavioral

problems.  He like to be the focus of the teacher's attention, and he would act out in a variety of

ways.  TR. 86.  When he did not have things his way, he would hide or run away.  TR. 86.  He

was disruptive when he had tantrums or wanted someone to chase him.  TR. 88.  Ronald liked to

play by himself.  If another child took something Ronald was playing with, he would hit them or

throw a tantrum.  TR. 86.  Ronald was off task about two to three times and hour, and it took three

to four attempts to redirect him.  Sometimes, Ronald did not return to the assigned task.  He was,

however, able to complete assignments within the allotted time.  TR. 87.

Ms. Debbie, who was also one of Ronald's preschool teachers, wrote that Ronald would

often talk back rudely, and liked to disturb the class at nap time.  Ronald needed to be told more

than three times to do something.  TR. 89-90.  Sometimes, he did not return to the assigned task.

-5-

He talked back to the teacher quite often, and disregarded the teacher's instructions.  Ms. Debbie

opined that this was not normal behavior for a child of his age.  TR. 89.

     C.    *Treatment Records.*

 On December 3, 2001, Ronald was examined by Conception S. Anayas, M.D., based on

complaints that he was exhibiting behavioral problems.  TR. 103.  Dr. Anayas noted that Ronald

"has been stealing from children in school, has short attention span, answers back constantly, does

not listen, disrupts class, wants to play all the time, [and] defies instructions from teachers . . . ."

*Id*.  Dr. Anayas' assessment was that Ronald suffered from, among other things, ADHD.  *Id*.  Dr.

Anayas saw Ronald again on January 17, 2002.  Dr. Anayas noted that Ronald was taking

Adderall.  TR. 102.

On December 11, 2001, Ronald began treatment at Devereux Outpatient Counseling

(Devereux).  TR. 157.  Paul Jacobsen, M.D., interviewed Ronald at Devereux on January 2, 2002.

Dr. Jacobsen observed that Ronald was hyperactive, fidgety, and unable to sit still.  He lost

attention and focus easily.  Dr. Jacobsen's assessment was that Ronald had ADHD with moderate

to severe psychosocial stressors.  He assessed Ronald's global assessment of functioning (GAF) as

30.[4]  TR. 157.  Ronald continued in treatment at Devereux with Lyris Miller, M.S., and Dr.

---

[4]  The GAF scale is used to report an individual's overall level of functioning.  A rating of 21-30 reflects:

> Behavior is considerably influenced by delusions or hallucinations OR serious impairment in communications or judgment (eg, sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) OR inability to function in almost all areas (eg, stays in bed all day; no job, home, or friends).

HAROLD I. KAPLAN, M.D. & BENJAMIN J. SADOCK, M.D., SYNOPSIS OF PSYCHIATRY 299 (8th ed.

Jacobsen.  In February 2002, Dr. Jacobsen observed that Ronald was occasionally intrusive and required redirection, but that he was not defiant.  Dr. Jacobsen increased the dosage of the Adderall Ronald was taking.  TR. 149.

In March 2002, Dr. Jacobsen observed that Ronald was only mildly fidgety.  He needed to be redirected, but responded well to the redirection.  Dr. Jacobsen changed Ronald's medication to Concerta.  TR. 148.  Later in the month, Herring told Dr. Jacobsen that Ronald continued to have breakthrough ADHD symptoms, but this information appeared to come from a babysitter and school teacher, rather than from personal observation.  Dr. Jacobsen examined Ronald and observed that he was not hyperactive or agitated.  He continued to treat him with Concerta.  TR. 147.

In April 2002, Herring told Dr. Jacobsen that she was receiving good reports from school about Ronald.  TR. 146.  However, in May 2002, Herring reported continuing breakthrough symptoms of ADHD.  Dr. Jacobsen increased Ronald's medication.  TR. 144.

In June 2002, Therapist Miller wrote that Ronald had periods in which he cooperated with treatment and responded well to behavior modification, but other times when he would actively defy rules and run about excessively.  TR. 142-43.  Dr. Jacobsen concurred with Miller's assessment.  When he examined Ronald in June 2002, he indicated that Ronald continued to have breakthrough ADHD symptoms according to reports from his parents.  However, Dr. Jacobsen observed that Ronald was neither disruptive nor fidgety during the time he was with the doctor.  TR. 140.

_____

1998) (SYNOPSIS OF PSYCHIATRY).

Also in June 2002, Miller prepared a functional assessment of Ronald's condition.  She opined that Ronald had a marked limitations in cognitive and communicative function because he did not know the alphabet, could not spell his name, and had not developed reading, mathematics, reasoning or problem-solving abilities.  She concluded that Ronald also had a marked limitation in the area of motor function, based on his problems with motor skills in the morning.  TR. 106.  She asserted that Ronald had a marked limitation in social function because he did not listen or pay attention, he talked back to adults, had temper tantrums and fought with others, and was uncooperative and impulsive, among other things.  She found that Ronald also had a marked limitation in personal function because he regularly woke up during the night in distress.  Finally, she opined that Ronald had marked limitations in concentration, persistence and pace based on his inability to focus, follow directions, and the like, which affected his school performance.  TR. 107.

On July 14, 2002, Stephanie G. Roberts, M.S., a registered mental health counselor, prepared an assessment of Ronald based on interviews and observations of Ronald with his family. She opined that Ronald was extremely hyperactive, inattentive, impulsive and had mood swings. He could not function for a child his age with respect to hygiene or communication.  TR. 109. Roberts reported that Ronald appeared to have a developmental delay and was cognitively slow. He had a violent temper at school, and he would hit and hurt others.  TR. 109.  After talking with Ronald, Roberts observed that he was shy, sad, depressed and withdrawn.  He could not follow a given topic and did not comprehend a lot of information.  Roberts believed that Ronald would benefit from speech therapy and cognitive testing, and that he should have an in-depth

psychological evaluation.  She agreed with Dr. Jacobson that Ronald had ADHD, ODD, and she

concluded that Ronald also had post-traumatic stress disorder.  TR. 111.

Thereafter, Sharon Winters, M.D., also affiliated with Devereux, began treating Ronald.  In

July 2002, Dr. Winters examined Ronald and asked him to draw a series of pictures.  She observed

that his drawings deteriorated in a short period of time from a simple heart with a smiley face to

scribbles of colors.  TR. 137.  Dr. Winters changed Ronald's medication to Adderall and Zyprexa.

She assessed his GAF level as 48.[5]  TR. 138-39.

Beginning in October 2002, Ronald was treated at Devereux by Aparna Kopuri, M.D.  TR.

132.  On the first visit, Dr. Kopuri observed that Ronald was stable, and that he was able to sit still

and answer questions appropriately.  Dr. Kopuri continued to treat Ronald with Zyprexa and added

Clonidine and Concerta.  TR. 132.  In subsequent visits, Herring continued to report that Ronald

was misbehaving, but Dr. Kopuri observed that Ronald was able to sit still, but he sometimes

would not answer questions.  TR. 127-31.

Beginning in May 2003, Ronald initiated conversation with Dr. Kopuri.  TR. 173.  In

subsequent visits with Dr. Kopuri, Herring indicated that Ronald was doing well.  TR. 167-69,

171-73.  In August 2003, Herring complained that Ronald was hyperactive and his motor skills

were not good in the morning.  Dr. Kopuri explained that this was because Ronald did not have

---

[5] A rating of 41-50 reflects:

Serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent
shoplifting) OR any serious impairment in social, occupational, or school functioning
(e.g., no friends, unable to keep a job).

SYNOPSIS OF PSYCHIATRY at 299.

any medication in his system when he first awoke.  After he received his medication, his motor skills improved, he calmed down, and was able to concentrate better.  TR. 170.

Records submitted to the Appeal Council reflect that Thomas Dow, M.D., at Halifax Behavioral Services examined Ronald on February 16, 2004.  Dr. Dow observed that Ronald's attention, concentration, insight and judgment were impaired.  He was impulsive and intrusive and he could not interact well with others.  Dr. Dow's assessment was ADHD with ODD, and a learning disorder.  He assessed Ronald's GAF at 40 to 50.  He treated Ronald with a variety of medication.  TR. 182-84.  Dr. Dow apparently continued to treat Ronald through April 2004.  TR. 177-79.

On February 24, 2004, Kelly McCabe, a targeted care manager apparently at Halifax, prepared a functional assessment of Ronald's condition.  McCabe opined that Ronald had extreme limitations in cognitive and communicative functioning based on his incoherent communication, talking to himself, and being below grade level in reading.  McCabe concluded that Ronald had a marked limitation in motor function based on his poor coordination and problems with activities of daily living in the morning.  TR. 175.  McCabe indicated that Ronald had an extreme limitation in social functioning based on his poor social skills and inability to establish relationships.  McCabe opined that Ronald also had an extreme limitation in personal functioning because his activities of daily living were not performed consistently with that expected of a child his age.  Finally, McCabe asserted that Ronald had extreme limitations in concentration, persistence or pace because he appeared to be unable to focus or to maintain consistent behavior.  TR. 176.  The form

is signed by another individual whose name is illegible.  There is nothing in the file to indicate the information upon which McCabe relied in preparing her assessment.

       *D.*    *Reviewing Professionals*.

       On May 16, 2002, Claire C. Husentruit, a Clinical Psychologist, prepared a Childhood Disability Evaluation Form after a review of Ronald's records. She concluded that he had ADHD, which resulted in less than marked limitations in the domains of attending and completing tasks, and interacting and relating with others, and no limitations in the other four domains.  TR. 122-25.

       On September 4, 2002, Pamela D. Green, Ph.D., a clinical psychologist, prepared a Childhood Disability Evaluation Form after a review of Ronald's records.  She concluded that he had ADHD, which resulted in marked limitations in the domain of attending and completing tasks, less than marked limitations in the domain of interacting and relating with others, and no limitations in the other four domains.  TR. 115-19.

## IV.    STANDARD OF REVIEW.

       The process for determining whether a child is disabled "begins with the ALJ determining whether the child is 'doing substantial gainful activity,' in which case [the child] is considered 'not disabled' and is ineligible for benefits.  20 C.F.R. §§ 416.924(a), (b)."  *Shinn*, 391 F.3d at 1278. "The next step is for the ALJ to consider the child's 'physical or mental impairment(s)' to determine if [the child] has 'an impairment or combination of impairments that is severe.' [20 C.F.R.] §§ 416.924(a), (c)."  *Id.*  A "physical or mental impairment" under the terms of the Act is one that results "from anatomical, physiological, or psychological abnormalities which can be

shown by medically acceptable clinical and laboratory diagnostic techniques . . . ."  20 C.F.R. § 416.908.

If the child has a severe impairment, "the ALJ next assesses whether the impairment 'causes marked and severe functional limitations' for the child.  20 C.F.R. §§ 416.911(b), 416.924(d).  Limitations arising from pain count in this determination.  *Id.* § 416.924(a)."  *Shinn*, 391 F.3d at 1278.  The impairment must be expected to cause death or last for a continuous period of not less than 12 months.  *Id*. at 1279.

"A child's impairment is recognized as causing 'marked and severe functional limitations' if those limitations 'meet[ ], medically equal[ ], or functionally equal[ ] the [L]istings.'  [20 C.F.R.] § 416.911(b)(1); *see also* §§ 416.902, 416.924(a)."  *Id.* at 1278 (alterations original). Limitations appearing in the listings are considered 'marked and severe.  *Id*.

If the child's impairments do not meet or equal a listed impairment, the ALJ can still conclude that the child's impairments are functionally equivalent to those in the Listings.  "In making this determination, the ALJ assesses the degree to which the child's limitations interfere with the child's normal life activities."  *Id*. at 1279.  The Code of Federal Regulations specifies six major domains of life that the ALJ should consider, namely:  (i) acquiring and using information; (ii) attending and completing tasks; (iii) interacting and relating with others; (iv) moving about and manipulating objects; (v) caring for yourself; and (vi) health and physical well-being.  20 C.F.R. § 416.926a(b)(1).  The Regulations further provide benchmarks that children should have achieved by certain ages.

"A child's impairment is of listing-level severity, and so functionally equals the listings, if as a result of the limitations stemming from that impairment the child has marked limitations in two of the domains . . . , or an extreme limitation in one domain." *Shinn*, 391 F.3d at 1279 (internal quotation marks and citation omitted).  A marked limitation in a domain exists when the "impairment(s) interferes seriously with [the claimant's] ability to independently initiate, sustain, or complete activities."  20 C.F.R. § 416.926a(e)(2)(i).  An extreme limitation in a domain exists when the "impairment(s) interferes very seriously with [the claimant's] ability to independently initiate, sustain, or complete activities."  *Id*. § 416.926a(e)(3)(i).

The scope of this Court's review is limited to determining whether the ALJ applied the correct legal standards, *Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988), and whether the findings are supported by substantial evidence, *Richardson v. Perales*, 402 U.S. 389, 390 (1971). "Substantial evidence is more than a scintilla, and must do more than create a suspicion of the existence of the fact to be established.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Walden v. Schweiker*, 672 F.2d 835, 838-39 (11th Cir. 1982)(internal quotations omitted).

The court "'must view the record as a whole, taking into account evidence favorable as well as unfavorable to the [SSA's] decision.'" *Walker v. Bowen*, 826 F.2d 996, 1000 (11th Cir. 1987)(quoting *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986)).  Even if the court finds that the evidence weighs against the SSA's decision, the court must affirm if the decision is supported by substantial evidence. *See Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990).  The court may not reweigh the evidence or substitute its own judgment, even if the court finds that the

-13-

weight of the evidence is against the SSA's decision.  *Id.*  While there is a presumption in favor of

the SSA's findings of fact, no such presumption attaches to the ALJ's legal conclusion about the

proper standards to be applied in evaluating claims.  *Welch v. Bowen*, 854 F.2d 436, 438 (11th Cir.

1988).  "Failure to apply the correct legal standard is grounds not for remand, but for reversal."

*Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1989); *see also Foote v. Chater*, 67 F.3d 1553, 1558

(11th Cir. 1995).

## V.     ANALYSIS.

Herring argues that the ALJ's determination that Ronald was not disabled is not supported

by substantial evidence.  Specifically, Herring asserts that the opinions of Therapist Miller and

Targeted Care Manager McCabe were supported by the evidence before the ALJ and, thus, that the

ALJ erred by failing to adopt their conclusions regarding Ronald's functional limitations.

Neither Miller nor McCabe is an acceptable medical source under the SSA regulations.

However, the ALJ may use the evidence from therapists, educational personnel and others to show

the severity of the claimant's impairment and to address how a child typically functions compared

to other children of the same age without the impairment.  20 C.F.R. § 416.913(d).

The ALJ considered the opinions of Miller and McCabe, but rejected them as extreme and

not consistent with the record as a whole.   The question presented, therefore, is whether the ALJ's

determination of Ronald's functional ability is supported by substantial evidence.

I will address the evidence as to each domain.

**Acquiring and Using Information.**  The regulations describe the skills that a preschool child[6] should have in this domain as follows:

> When you are old enough to go to preschool or kindergarten, you should begin to learn and use the skills that will help you to read and write and do arithmetic when you are older. For example, listening to stories, rhyming words, and matching letters are skills needed for learning to read. Counting, sorting shapes, and building with blocks are skills needed to learn math. Painting, coloring, copying shapes, and using scissors are some of the skills needed in learning to write. Using words to ask questions, give answers, follow directions, describe things, explain what you mean, and tell stories allows you to acquire and share knowledge and experience of the world around you. All of these are called "readiness skills," and you should have them by the time you begin first grade.

20 C.F.R. § 416.926a(g)(2)(iii).

Ms. Robinson, one of Ronald's preschool teachers, wrote that his academic performance was high.  Dr. Winters observed that Ronald's ability to draw deteriorated over a short time. There is no other evidence in the record, except McCabe and Miller's conclusory statements, that Ronald had problems learning skills that would help him to read, write and do arithmetic.  Dr. Kopuri noted that, for a time, Ronald did not answer questions, but it appears this was not because Ronald could not communicate.  The evidence reflects that Ronald later initiated conversation with Dr. Kopuri.  Ms. Roberts opined that Ronald would benefit from speech therapy, but it appears that this recommendation was based on her assessment that Ronald could not follow a topic and comprehend information, rather than that he had a problem using words to express

---

[6] The ALJ  cited the provisions relating to school-age children (age 6 to attainment of age 12). TR.  18-20.  Ronald was only six years old at the time of the hearing.  Therefore, the applicable standard is the one for preschool children.

himself.  There is, therefore, substantial evidence in the record to support the ALJ's conclusion

that Ronald did not have marked or extreme limitations in this domain.

　　　　**Attending and Completing Tasks.**  The regulations describe the skills that a preschool

child should have in this domain as follows:

> As a preschooler, you should be able to pay attention when you are spoken to directly,
> sustain attention to your play and learning activities, and concentrate on activities like
> putting puzzles together or completing art projects. You should also be able to focus
> long enough to do many more things by yourself, such as getting your clothes together
> and dressing yourself, feeding yourself, or putting away your toys. You should usually
> be able to wait your turn and to change your activity when a caregiver or teacher says
> it is time to do something else.

20 C.F.R. § 416.926a(h)(2)(iii).  The regulations describe limitations of function in this domain to

include the following:

> (i) You are easily startled, distracted, or overreactive to sounds, sights, movements, or
> touch.

> (ii) You are slow to focus on, or fail to complete activities of interest to you, e.g.,
> games or art projects.

> (iii) You repeatedly become sidetracked from your activities or you frequently interrupt
> others.

> (iv) You are easily frustrated and give up on tasks, including ones you are capable of
> completing.

> (v) You require extra supervision to keep you engaged in an activity.

*Id.* § 416.926a(h)(3).

　　　　The ALJ concluded that Ronald had more than slight but less than marked limitations in

this domain based on the evidence from Devereux that Ronald's ability to sit still and answer

questions appropriately improved over time and that he was less fidgety and hyperactive. TR. 18.

-16-

While the Devereux doctors' treatment notes do reflect such improvement when Ronald was visiting the doctors, the notes also acknowledge that Ronald had other occasions when he had breakthrough symptoms of ADHD.  These symptoms are well described by Ronald's two preschool teachers, who wrote that Ronald frequently interrupted his classmates, repeatedly became sidetracked and required extra supervision.

It is not clear from the ALJ's decision why she choose to accept the part of the Devereux doctors' reports that said Ronald improved when visiting the doctors, but reject the indication in the same records that Ronald still had breakthrough episodes of ADHD symptoms, the results of which are adequately documented in the record.  Nevertheless, it is clear from the ALJ's summary of the evidence that she considered the evidence as a whole, even if she did not specifically refer to every piece of evidence in the opinion.  *Cf. Dyer v. Barnhart*, 395 F.3d 1206, 1211 (11th Cir. 2005)(noting that the ALJ is not required to recite all of the evidence so long as the decision is sufficient to allow the Court to conclude that the ALJ considered the claimant's medical condition as a whole).  Under these circumstances, because substantial evidence supports the ALJ's articulated reason for concluding that Ronald had less than marked limitations in this domain, this Court cannot overturn that conclusion.  *Id.* at 1210 ("If the Commissioner's decision is supported by substantial evidence, this Court must affirm, even if the proof preponderates against it.") (internal quotation marks and citation omitted).

**Interacting and Relating with Others.**  The regulations describe the skills that a preschool child should have in this domain as follows:

> At this age, you should be able to socialize with children as well as adults. You should begin to prefer playmates your own age and start to develop friendships with children who are your age. You should be able to use words instead of actions to express yourself, and also be better able to share, show affection, and offer to help. You should be able to relate to caregivers with increasing independence, choose your own friends, and play cooperatively with other children, one-at-a-time or in a group, without continual adult supervision. You should be able to initiate and participate in conversations, using increasingly complex vocabulary and grammar, and speaking clearly enough that both familiar and unfamiliar listeners can understand what you say most of the time.

20 C.F.R. § 416.926a(i)(2)(iii).

The ALJ concluded that Ronald had slight but less than marked limitations in this domain based upon his history of oppositional defiant disorder.  She noted that Ronald had been able to relate well during mental status assessments.  Further, Ronald's teachers reported that while Ronald was intrusive at times, he responded to redirection without defiance or resistence.

 Oppositional defiant disorder, by definition, is a pattern of disobedient, hostile, and defiant behavior toward authority figures.  The records reflect that Ronald was diagnosed with ODD at least by July 2002, and that the diagnosis was confirmed by Dr. Dow as late as February 2004. This was, therefore, an ongoing problem.  All treating psychiatrists concluded that Ronald had serious impairments in his ability to function, as reflected by GAF scores ranging from 30 to 50.

It is unclear what the ALJ relied upon to conclude that Ronald responded well to redirection from his teachers without defiance or resistence.  Ms. Robinson indicated that Ronald would talk

-18-

back a lot.  When he did not have things his way, he would hide or run away.  Ms. Debbie wrote that Ronald would often talk back to her rudely and would not follow her instructions.  They also reported that Ronald had difficulty playing with other children.  Miller also reported that Ronald would occasionally defy rules. These reports are consistent with Herring's testimony that Ronald would not listen to her or to his father, and argued and fought with his siblings.

Accordingly, substantial evidence does not support the reasons stated by the ALJ for concluding that Ronald had less than marked limitations in this domain.  If the ALJ, after consideration of all of the evidence, determined, as McCabe did, that Ronald's impairment in this domain was extreme, his condition would be functionally equal to a listed impairment.  Because the determination of the degree of limitation is one entrusted to the Commissioner, remand is required to assess the degree of Ronald's impairment in this domain.  *See Williams v. Massanari*, No. CA 00-0787-BH-C, 2001 WL 530458 (S.D. Ala., May 10, 2001)(remanding for further consideration when ALJ ignored certain pieces of evidence in making functional equivalence determination).

**Moving About and Manipulating Objects**.  The regulations describe the skills that a preschool child should have in this domain as follows:

> As a preschooler, you should be able to walk and run with ease. Your gross motor skills should let you climb stairs and playground equipment with little supervision, and let you play more independently; e.g., you should be able to swing by yourself and may start learning to ride a tricycle. Your fine motor skills should also be developing. You should be able to complete puzzles easily, string beads, and build with an assortment of blocks. You should be showing increasing control of crayons, markers, and small pieces in board games, and should be able to cut with scissors independently and manipulate buttons and other fasteners.

20 C.F.R. § 416.926a(j)(2)(iii).

-19-

The ALJ found no evidence of limitations in this domain.  This conclusion is supported by substantial evidence.  Although Ronald had problems with motor skills when he awoke in the morning, Dr. Kopuri explained that this was caused by the lack of medication in his body.  Once his medication became effective, Ronald's motor skills improved.  Ronald testified that he was able to dress himself, brush his teeth and comb his hair.  Both of his teachers described Ronald's ability to run.

**Caring for Yourself.**  The regulations describe the skills that a preschool child should have in this domain as follows:

> You should want to take care of many of your physical needs by yourself (e.g., putting on your shoes, getting a snack), and also want to try doing some things that you cannot do fully (e.g., tying your shoes, climbing on a chair to reach something up high, taking a bath). Early in this age range, it may be easy for you to agree to do what your caregiver asks. Later, that may be difficult for you because you want to do things your way or not at all. These changes usually mean that you are more confident about your ideas and what you are able to do. You should also begin to understand how to control behaviors that are not good for you (e.g., crossing the street without an adult).

20 C.F.R. § 416.926a(k)(2)(iii).

The ALJ found no limitations in this domain because Ronald was able to care for his personal needs.  This conclusion is supported by substantial evidence in the record.  As noted above, Ronald was able to dress himself, brush his teeth and comb his hair.  While there was some indication of disturbance in Ronald's sleep due to night terrors, none of his treating doctors indicated that this was a significant problem.

**Health and Physical Well-Being.**  This domain assesses "the cumulative physical effects of physical or mental impairments and their associated treatments or therapies on . . . functioning"

that were not considered under other domains.  20 C.F.R. § 416.926a(l).  The ALJ found no

limitations in this domain.  Each of the other individuals who opined about Ronald's functioning in

this domain also concluded that he had no limitations.  Substantial evidence in the record supports

this conclusion.

Although I have only found the evidence insufficient to support the ALJ's finding in one

domain, new evidence was presented from Dr. Dow after the ALJ's decision was rendered.  The

SSA must consider this new evidence on remand and determine whether it changes the

determination of the degree of Ronald's impairment in any domain.

**VI.**   **CONCLUSION.**

Based on the foregoing reasons, it is **ORDERED** that the decision of the Commissioner is

**REVERSED** and **REMANDED** for further proceedings.  The Clerk of Court is directed to issue a

judgment consistent with this Order and, thereafter, to close the file.

**DONE** and **ORDERED** in Orlando, Florida this 21st day of February, 2006.

*Karla R. Spaulding*

KARLA R. SPAULDING
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:
Counsel of Record
Unrepresented Parties